# In the United States Court of Federal Claims

No. 19-674
Filed: January 16, 2020
Reissued: February 3, 2020[1]

|  |  |  |
|---|---|---|
| HARMONIA HOLDINGS GROUP, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Pre-Award Bid Protest; Post-Award Bid Protest; Tucker Act; Administrative Procedure Act; Federal Supply Schedule; |
| THE UNITED STATES, | ) ) ) | Schedule 70; Solicitation Amendment; Task Order; Best Value; Standing; *Blue &* |
| Defendant, | ) ) | *Gold Fleet, L.P. v. United States*; Waiver; Agency-Level Protest; Best Value; |
| and | ) ) | Technical Evaluation. |
| DEV TECHNOLOGY GROUP, INC., | ) ) | |
| Defendant-Intervenor. | ) ) | |

*Walter Brad English*, Maynard, Cooper & Gale PC, Huntsville, AL, for plaintiff.

*David M. Kerr*, U.S. Department of Justice, Civil Division, Washington, DC, for defendant.

*William A. Shook*, Law Offices of William A. Shook, PLLC, Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

***SMITH*, Senior Judge**

This pre- and post-award bid protest comes before the Court on the parties' Cross-Motions for Judgment on the Administrative Record. Plaintiff, Harmonia Holdings Group, LLC ("Harmonia"), challenges the evaluation of offerors and the award decision made by the United States Customs and Border Protection ("CBP" or "Agency") for application development and operations and maintenance support services under Solicitation No. HSBP1018CSPD, Request for Quote 1317188 (hereinafter "Solicitation" or "RFQ"). Specifically, plaintiff challenges the Agency's decision to prohibit offerors from modifying certain portions of their proposals in response to Amendments 9 and 10 to the Solicitation. *See*

---

[1] An unredacted version of this opinion was issued under seal on January 16, 2020. The parties were given an opportunity to propose redactions, but no such proposals were made.

*generally* Plaintiff's Harmonia Holding Group, LLC's Motion for Judgment on the Administrative Record and Brief in Support Thereof (hereinafter "Pl.'s MJAR"). Plaintiff also challenges the task order award to defendant-intervenor, Dev Technology Group, Inc. ("Dev Tech"). *See generally id.* In response, defendant contends plaintiff is not an "interested party" and therefore lacks the requisite standing to bring suit, that the Agency properly exercised its discretion in denying offerors the ability to amend their proposals, and that plaintiff "failed to demonstrate that the [award] decision was irrational or the result of prejudicial violations of law." Defendant's Motion to Dismiss and, in the Alternative, Cross-Motion for Judgment upon the Administrative Record and Response to Plaintiff's Motion for Judgment on the Administrative Record (hereinafter "Def.'s CMJAR") at 1. For the reasons set forth below, the Court denies plaintiff's Motion for Judgment on the Administrative Record and grants defendant and defendant-intervenor's Cross-Motions for Judgment on the Administrative Record. Additionally, the Court denies defendant's Motion to Dismiss.

## I.      Background

### A.  The Solicitation

On July 12, 2018, CBP issued the Solicitation, requesting quotes for development and operations and maintenance support services for its Cargo Systems Program Directorate ("CSPD") to develop and support cargo systems applications under the General Services Administration's ("GSA") Federal Supply Schedule ("FSS"). Administrative Record (hereinafter "AR") 2981. The CSPD "is responsible for managing the Automated Commercial Environment (ACE), which is a commercial trade processing system" that "helps reduce the Nation's vulnerability to changing threats without diminishing economic security, by providing threat awareness, prevention, and protection for the homeland." *Id.*

CBP indicated its intent to issue a single time and materials task order award with a one-year base period, four (4) one-year option periods, and a six-month option to extend services. AR 235, 270, 1576. Offerors were to be evaluated in two phases. AR 235. Only GSA Information Technology ("IT") Schedule 70 SIN 132 51-IT small business contractors were eligible to participate in Phase I, which involved Oral Presentations. *Id.* The Agency would then evaluate Phase I offerors on a best value basis and assign each offeror an overall adjectival quality rating. AR 235, 280. Offerors with a "high likelihood of being selected [for award were] therefore encouraged to participate in the acquisition of Phase II RFQ." *Id.* Though all Phase I respondents were permitted to participate in Phase II, the Agency encouraged offerors that received a rating of "some confidence" or "low confidence" not to participate in Phase II.[2] AR 235, 280, 2985–86.

Offerors that participated in Phase II were subsequently evaluated on a best value basis according to the following five factors: (1) Technical Excellence; (2) Management Approach; (3) Quality Assurance; (4) Past Performance; and (5) Price. AR 281–85. Prior to Amendments 9 and 10, Factors 1, 2, and 3 each included three sub-factors, some of which related to one of the

---

[2]      Of the thirty-five offerors that submitted proposals, the Agency advised twenty-two not to participate in Phase II based on the adjectival ratings they received. AR 2985–86.

Tasks outlined in the Statement of Work ("SOW").  AR 281–84.  Under the prescribed best value tradeoff, Factor 1 is "more significantly important than Factors 2, 3, and 4; Factors 2 and 3 are of equal importance and significantly more important than Factor 4," and the "non-Price Factors, when combined are significantly more important than the Price Factor (Factor 5)."  AR 286.  The Agency was to award the task order "to the Offeror whose proposal has been determined [to] represent the best value to the Government."  AR 235.

Before instituting Amendments 9 and 10, the Solicitation directed the Agency to assess proposals in accordance with the following seven tasks in the SOW during its Phase II evaluations: Task 1 – Contractor Transition In; Task 2 – Contractor Transition Out; Task 3 – Cargo Systems Application Development; Task 4 – Dev/Ops Configuration and Release Management; Task 5 – ACE Business Intelligence Capabilities; Task 6 – IT System Security Analysis; and Task 7 – Operations and Maintenance.  AR 297.  Each of those tasks corresponded to a specific evaluation factor as follows:

| Factor | Sub-Factor(s) |
|---|---|
| Technical Excellence (Factor 1) | Sub-Factor I, Section 4 SOW Tasks (3, 4, 5, and 7)<br><br>Sub-Factor II, Section 4 SOW Tasks 6<br><br>Sub-Factor III, Risk Mitigation Plan |
| Management Approach (Factor 2) | Sub-Factor I, Staffing Plan/Key Personnel Resumes<br><br>Sub-Factor II, Program Management Approach<br><br>Sub-Factor III, Subcontractor Management Plan/Teaming Arrangements |
| Quality Assurance (Factor 3) | Sub-Factor I, Transition In Plan, SOW Section 4, Task 1<br><br>Sub-Factor II, Performance Metrics, SOW Section 9<br><br>Sub-Factor III, Software Engineer Lifecycle, SOW Section 6.13 |
| Past Performance (Factor 4) | |
| Price (Factor 5) | |

AR 281–85.  The Solicitation further stipulated how each of those tasks tied into the Time and Materials ("T&M") contract line items ("CLINs") for purposes of Phase II, Factor 5 evaluations. As of Amendment 8, those CLINs were as follows: (1) Base Development CLIN 001 (Tasks 1, 2, 3, and 4); (2) On-Demand Services Development CLIN 002 (Tasks 3 and 4); (3) Base Operation and Management ("O&M") CLIN 003 (Tasks 1, 2, 5, and 6); and (4) On-Demand Services O&M CLIN 004 (Tasks 5 and 6).  AR 1533–34.  Offerors were to submit pricing in

accordance with their technical proposal for each CLIN based on the Sample Price Format spreadsheet included as Attachment C to the RFQ.  AR 348, 388.

Prior to Amendment 9, the Sample Price Format included over ninety labor categories across all four CLINs and employed a color code to delineate between labor categories needed at the time of award and those the Agency may need after performance commences.  AR 334–42, 548, 1533–34.  The Solicitation specified that offerors must use fully-burdened labor rates inclusive of all direct and indirect costs and profit, and, if awarded the contract, be able to "provide the necessary management, labor, facilities, materials and supplies to perform tasks as stated in the task order contract for T&M within the scope of Section IV [SOW]."  AR 237.

The Solicitation also indicated the possibility of "additional services that the Government may purchase," or Surge Requirements, which are defined as "any additional work that can be performed under the scope of this SOW resulting from additional functionality that may be required by ACE to perform."  AR 270, 307.  Section 5.0 of the SOW explained that, if the Agency later determines Surge Requirements are needed, "the Government may exercise the surge CLINS as identified in the task order which will be separately priced and inserted on the Optional Surge CLINs via modification to the Task Order."  AR 307; *see also* AR 270.  Prior to Amendments 9 and 10, offerors were required to submit proposed prices for Surge Requirements in the Sample Price Format under the designated Surge CLINs, or CLINs 002 and 004.  *Compare* AR 270, *with* AR 1696.

## B.  Amendments 9 and 10

Prior to making an award decision, but after receiving proposals from Phase II offerors, the Agency issued two key amendments to the Solicitation, both of which are at issue in this protest.  *See generally* AR 1537–1637 (Amendment 9), 1638–96 (Amendment 10); *see also* Pl.'s MJAR at 4.  The first is Amendment 9, which CBP issued on October 26, 2018.  AR 1537.  Amendment 9 altered the period of performance ("PoP"), clarified ordering procedures for "On-Demand/Surge" CLINs, required revised Factor 2, Sub-Factor I and Factor 5 proposals from offerors, and revised the Sample Price Format.  AR 1576, 1577, 1584, 1593–94, 1637.  Amendment 9 also eliminated Task 5 and renumbered Tasks 6 and 7 as Tasks 5 and 6, respectively.  AR 1604.  The resulting tasks include: Task 1 – Contractor Transition In; Task 2 – Contractor Transition Out; Task 3 – Cargo Systems Application Development; Task 4 – Dev/Ops Configuration and Release Management; Task 5 – IT System Security Analysis; and Task 6 – Operations and Maintenance.  *Id.*  To further clarify relationships between tasks and evaluation factors, Amendment 9 added Task 2 to Factor 3 and eliminated "Sub-Factor III, Software Engineer Lifecycle, SOW Section 6.13" from Factor 3.  AR 1587–91.  The result of these modifications is reproduced as follows:

| Factor | Sub-Factor(s) |
|---|---|
| Technical Excellence (Factor 1) | Sub-Factor I, Section 4 SOW Tasks (3, 4, **and 6**) <br><br> Sub-Factor II, Section 4 SOW **Task 5** <br><br> Sub-Factor III, Risk Mitigation Plan |
| Management Approach (Factor 2) | Sub-Factor I, Staffing Plan/Key Personnel Resumes <br><br> Sub-Factor II, Program Management Approach <br><br> Sub-Factor III, Subcontractor Management Plan/Teaming Arrangements |
| Quality Assurance (Factor 3) | Sub-Factor I, Transition In Plan, SOW Section 4, Task 1 <br><br> Sub-Factor II, Performance Metrics, SOW Section 9, **Task 2** |
| Past Performance (Factor 4) | |
| Price (Factor 5) | |

*See id.* (emphases added).

With respect to the Sample Price Format, Amendment 9 reduced the number of labor categories from ninety to ten based on the Agency's pre-existing color code designations. *Compare* AR 1475, *with* AR 1637. This change corresponded with the Agency's decision to identify CLINs as either "Required Services" or "On-Demand/Surge Services." AR 1593. Required Services "are services that the Government [has] identified as work needed now to support the SOW." *Id.* For those services, offerors were required to "propose rates based on their proposed labor category name," but were prohibited from changing the number of Full Time Employees ("FTEs") to support those labor categories. *Id.* On-Demand/Surge Services, on the other hand, are "services that the Government may identify [for] work in the future to support the SOW." *Id.* Pursuant to an addition under Section 7.0 of the SOW,[3] and based on additional information the Agency would provide, offerors had to "provide a detailed Staffing Plan when the On-Demand/Surge CLINS are needed (each time), [which] will be issued via modification to the [Task Order]." AR 1589.

To implement these changes, the Agency added the phrase "Required" before "Base Development" and "Base O&M" in the titles of CLINs 001 and 003, respectively, and changed the phrase "On-Demand Services" to "On-Demand/Surge Services" before "Development" and "O&M" in the titles of CLINs 002 and 004, respectively. *Compare* AR 1533–34, *with* AR 1637. The Agency also established an estimated ceiling/Not-To-Exceed ("NTE") amount to support

---

[3]     Section 7.0 of the SOW is titled "Roles and Responsibilities Agile Framework Requirements." AR 1589.

On-Demand/Surge CLINs.  AR 1593. The Agency further indicated that any unused capacity from those amounts would "carry forward," and future On-Demand/Surge ceiling/NTE amounts could be used to meet the needs of any "current requirement" "during any given PoP."  *Id.*  Last, offerors were restricted to inputting FTE amounts to support their technical solutions for the Required Base CLINs consistent with their revised Staffing Plans, but they were directed not to revise NTE amounts listed in the Sample Price Format for the On-Demand/Surge CLINs, or CLINs 002 and 004.  AR 1593–94.

On November 1, 2018, CBP issued Amendment 10, which added Federal Acquisition Regulation ("FAR") 52.219-14, Limitations on Subcontracting (JAN 2017), to the Solicitation, altered the PoP, and added Task 4 to CLIN 003 in the Sample Price Format.  AR 1638, 1677, 1692, 1696.  Amendment 10 also reiterated that offerors must submit price proposals based on the Sample Price Format and in accordance with their technical proposals.  AR 1684.  With respect to Factor 2, Sub-Factor I, Amendment 10 explained the following:

> The Offeror shall provide a Staffing Plan, [sic] for CLIN 003 that outlines how they plan to recruit, hire, retain, and replace personnel to ensure a full range of services in support of all requirements and ensure mission success.  The Offeror shall ensure the Staffing Plan Table and Price Proposal is consistent.  If there is an inconsistency between the Staffing Plan Table and Price Proposal, the proposal may be found non-compliant and be removed from award consideration.
>
> Staffing Plans for CLINS 001, 002, and 004 are not expected from the Offeror at this time.  In addition, the Offeror shall provide a detailed Staffing Plan when the On-Demand/Surge CLINS (CLINS 002 and 004) are needed (each time), and this will be issued via modification to the [task order].  Additional information, such as specifications of the additional within scope requirement will be provided to assist the Offeror in the determination of the [FTEs] and the Staffing Plan.

AR 1689–90.  Amendment 10 repeated the applicability of those changes to Factor 5, and further specified that "[NTE] values will be utilized for CLINS 001, 002 and 004."  AR 1692.  In connection with the changes under Amendments 9 and 10, the Agency limited offerors' modifications to Factor 2, Sub-Factor I (Staffing Plan/Key Personnel Resumes) and Factor 5 (Price), with limited proposal revisions due on or before November 13, 2018.  AR 1537, 1638, 1685.  Harmonia timely submitted its revised proposal.  Pl.'s MJAR at 5.

### C.  Evaluation of Proposals and Task Order Award

The Solicitation notified offerors that, "if an Offeror receives a high[-]risk rating, regardless of technical ratings or price, that Offeror may not be considered for award."  AR 286. Evaluation Board Members and Advisors were also explicitly notified of this limitation in their Evaluation Team Training presentation for this procurement.  AR 30.  Though the Solicitation did not define high-risk, each of the Consensus Technical Evaluation Panel reports defined it as a risk "[l]ikely to cause significant serious disruption of schedule; increase in cost, or degradation of performance even with special Contractor emphasis."  *See, e.g.*, AR 2936.  A "medium risk" is a risk that "[c]an potentially cause some disruption of schedule, increase in cost, or

degradation of performance.  However, special Contractor emphasis will probably be able to overcome difficulties."  *Id.*  The Consensus Technical Evaluation Panel reports also defined five adjectival ratings applicable to Factors 1, 2, and 3.  *See* AR 2935–36.  Of relevance, an offeror would receive a "Marginal" rating if their proposal "demonstrates a shallow understanding of the requirements and an approach that only marginally meets performance or capability standards necessary for minimal but acceptable contract performance."  AR 2936.

In its March 25, 2019 Comparative Analysis and Best Value Determination Report (hereinafter "BVD Report"), the Agency provided a comprehensive explanation for how it assigned overall adjectival and risk ratings to offerors' proposals.  *See generally* AR 2980–3059.  Consistent with those explanations and the terms of the Solicitation, the Agency assigned Harmonia an overall "High Risk/Marginal" rating for Factor 2, an overall "Medium Risk/Marginal" rating for Factor 3, and "High Risk/Marginal" ratings for Factor 2, Sub-Factors I and II, and Factor 3, Sub-Factor I.  AR 3049.

With respect to Factor 2, Sub-Factor I, the Agency assigned Harmonia's proposal Marginal and high-risk ratings, as Harmonia's "proposal relating to Amendment 0010, Figure 8, pg. 36, shows the O&M teams aligned to the CBP capability owners for four areas . . . [and] [w]hile aligning teams to functional areas is documented as a benefit to the Government, Harmonia did not include functional areas for Cargo Release, [Foreign Trade Zone ('FTZ')], [International Trade Data System ('ITDS')], or [Automated Export System ('AES'),] which are major areas of functionality in O&M," and are listed in Attachment E to the SOW.  AR 3027; Def.'s CMJAR at 31.  Due to these omissions, the Agency concluded Harmonia's proposal posed a high-risk, "as the proposed staffing plan (related to CLIN 0003) will be insufficient, and cost will increase due to the delay in transitioning the applications."  AR 3027.

For Factor 2, Sub-Factor II, the Agency concluded that "[n]o strengths were identified" and assigned Harmonia Marginal and high-risk ratings.  AR 3027–28.  The Agency similarly based these ratings on Harmonia's "omission of certain critical applications," as "the omission of Cargo Release, ITDS, FTZ, and AES applications, [sic] demonstrates that Harmonia does not fully understand the SOW requirements."  *Id.*  The Agency further found that, based on certain statements in Harmonia's proposal, "Harmonia believes ITDS and Cargo Release are not covered by the contract, when indeed they are, as well as AES as stated in the SOW."  AR 3027.

Finally, though the Agency attributed certain benefits to Harmonia's proposal under Factor 3, Sub-Factor I, it ultimately assigned Harmonia Marginal and high-risk ratings because Section 3.1.5 of the proposal listed "groupings of functionality covered by the requirement upon transitioning in," but failed to include Cargo Release, ITDS, and AES, which are "tasks that are required in transitioning in."  AR 3028.  The Agency explained that a "high risk has been identified as these applications are major [ACE] functionalities and the omission of these critical [ACE] functionalities would lead to unsuccessful performance."  *Id.*

Based on these ratings, the Agency provided the following explanation for its decision to "remove[] [Harmonia] from the tradeoff analysis":

Dev Tech is more highly ranked than Harmonia, **_which is considered the lowest ranked technical solution_**.  A lower technical solution at a higher price of an additional $10,134,901.02 or 3.11% higher is not in the best interest of the Government.  In addition, **_Harmonia is not among the Quoters considered for award due to their_** Marginal and **_High[-]Risk rating_** received for their proposed Factor 2 Management Approach solution and Marginal and Medium Risk rating received for their proposed Factor 3 Quality Assurance solution.

AR 3052 (emphases added).  Offerors such as Harmonia were also excluded from the tradeoff analysis because "[k]eeping these Quoters in the Trade-off process would pose a significant risk to cost, schedule and performance for the overall CSPD program and CBP mission."  *Id.*  Accordingly, on April 23, 2019, the Agency notified Harmonia of its decision to award the task order to Dev Tech.  AR 3060–61.

## II.      Procedural History

### A.      Pre-Award Agency-Level Protest

In response to the changes imposed by and implemented through Amendments 9 and 10, on November 12, 2018, Harmonia filed a pre-award protest with the Agency before the deadline for submission of bids.  *See generally* AR 2490–94.  In that agency-level protest, Harmonia claimed that offerors should be allowed to modify their proposals with respect to Factor 1, Factor 2, and Factor 3, Sub-Factors I and II, and not be limited to modifying their proposals with respect to Factor 2, Sub-Factor I and Factor 5.  AR 2492–94.  Harmonia made this request in part based on its assertion that, prior to Amendment 10, offerors "had to provide proposed labor categories, rates, and FTEs for *all* CLINs," and the inclusion of Amendment 10 "made a change to ask Offerors to propose labor categories and FTE counts for only CLIN 001, labeled as 'Required – Base Development' (but including only 2 FTEs for management labor categories) and CLIN 003, labeled as 'Required – Base O&M' in Attachment C."  AR 2492 (emphasis added).  Harmonia also alleged that Amendment 10 "contained a material change to the solicitation by changing the fundamental definition of which tasks are performed under each CLIN," as Amendment 10 added Task 4 to CLIN 003.  *Id.*  Harmonia claimed that, by identifying CLINS 002 and 004 as optional services that the Agency would request via modification(s) to the Task Order on an as-needed basis, Amendment 10 effectively "recast[ed] [] pricing."  AR 2492–93.  According to Harmonia, this mattered because "Offerors were asked [] a question about operating both development and O&M as a whole" during the Phase I Oral Presentations, such that "Offerors would have developed a technical solution that took into account an integrated team consisting of both development and O&M resources, as well as a single support team."  *Id.*

In addition to pricing concerns, Harmonia protested the addition of FAR 52.219-14, Limitations on Subcontracting (JAN 2017), pursuant to Amendment 10, as the addition had "a material impact on [Harmonia's] overall technical, management, transition, and staffing solution."  AR 2493.  Harmonia also contended that "the law permits changes to the entire solicitation," as FAR 52.215-1 "permits Offerors to make the necessary adjustments to all parts of a proposal in response to an amendment."  *Id.*  Thus, the collective "changes potentially affect

all evaluation factors," and restricting offerors to modifying only Factor 2, Sub-Factor I and Factor 5 "creates multiple problems." AR 2490, 2492.

On December 6, 2018, the Agency issued a decision denying Harmonia's pre-award protest on all grounds. *See generally* AR 2898–901. In response to Harmonia's assertion that offerors should have been allowed to update their entire proposal, the Agency stated that Amendments 9 and 10 were issued to provide all Phase II offerors "additional flexibility towards pricing." AR 2899. Amendment 10 "did not change the overall technical solution to be performed under the contract, [and, as] a result, the Government does not believe this constitutes a material change to the solicitation." AR 2899. Regarding the addition of FAR 52.219-14, the Agency explained that it had "inadvertently omitted" the clause in the original solicitation, and that, "[i]n recognition that Offerors may need to modify their teaming strategies, the Government will proceed with evaluations treating all Offerors with neutrality regarding compliance with this clause." *Id.* Finally, to address Harmonia's FAR 52.215-1 argument, the Agency explained that FAR 52.215-1 "does not apply to this procurement," as the procurement was "conducted in accordance with FAR Part 8." AR 2900.

### B.  Protests Before this Court

On May 7, 2019, Harmonia filed its bid protest with this Court; two additional disappointed offerors filed separate protests with this Court shortly thereafter. *See generally* Plaintiff's Complaint; *see also Excella, Inc. v. United States*, No. 19-763; *Niksoft Sys. Corp. v. United States*, No. 19-779. As a result of these three directly-related protests, the Agency voluntarily stayed performance pending resolution of the merits of the protests. On May 28, 2019, plaintiff filed an amended complaint and, on June 4, 2019, its Motion for Judgment on the Administrative Record. *See generally* Plaintiff's Amended Complaint; *see generally* Pl.'s MJAR. On June 18, 2019, defendant filed its Motion to Dismiss, Cross-Motion for Judgment on the Administrative Record, and Response. *See generally* Def.'s CMJAR. Defendant-intervenor filed its Cross-Motion for Judgment on the Administrative Record and Response that same day. *See generally* Defendant-Intervenor's Cross-Motion for Judgment on the Administrative Record and Response to Plaintiff's Motion for Judgment on the Administrative Record (hereinafter "Def.-Int.'s CMJAR"). Plaintiff filed its Response and Reply on June 27, 2019. *See* Plaintiff's Reply and Response to Defendant's Motion to Dismiss and Cross Motions for Judgment on the Administrative Record (hereinafter "Pl.'s Resp.").

On July 5, 2019, defendant filed an unopposed motion to stay proceedings pursuant to Rule 52.2 of the Rules of the Court of Federal Claims ("RCFC"), requesting that the Court "stay the proceedings in this case and remand this case to the Customs and Border Patrol." Defendant's Motion to Stay Proceedings and Defendant's Motion for Voluntary Remand, ECF No. 31, at 1. A remand would permit the Agency to "thoroughly consider" allegations regarding the Agency's price evaluation made on behalf of a protestor in a directly-related case. *Id.*; *see generally Niksoft Systems Corp. v. United States* (No. 19-779). The Court granted defendant's Unopposed Motion on July 9, 2019. *See generally* Order Granting Motions to Stay and Remand, ECF No. 32. The stay and remand concluded on September 9, 2019.

Pursuant to the Court's Revised Scheduling Order, on September 20, 2019, defendant and defendant-intervenor filed their respective Responses and Replies.  *See generally* Defendant's Reply in Support of Its Motion to Dismiss and, in the Alternative, Cross-Motion for Judgment upon the Administrative Record; *see generally* Defendant-Intervenor's Reply in Support of Its Cross-Motion for Judgment on the Administrative Record.  The Court held oral argument on October 3, 2019.  The parties' Motions are fully briefed and ripe for review.

## III.      Jurisdiction

This Court's jurisdictional grant is found primarily in the Tucker Act, which gives the Court the following power:

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b) (2018).  This authority exists "without regard to whether suit is instituted before or after the contract is awarded." *Id.*  Though this Court ordinarily does not have jurisdiction over task order awards by virtue of the statutory framework set forth under the Federal Acquisition Streamlining Act of 1994, 10 U.S.C. § 2304c(e)(1) (2018), that statutory constraint does not apply to the Court's jurisdiction over task order protests under GSA FSS contracts.  *See, e.g.*, *Distrib. Sols., Inc. v. United States*, 106 Fed. Cl. 1, 11 (2012), *aff'd*, 500 Fed. App'x 955 (Fed. Cir. 2013).

## IV.      Discussion

In its Motion for Judgment on the Administrative Record, plaintiff claims the Agency "arbitrarily and irrationally refused to allow proposal amendments following Amendments 9 and 10" to the Solicitation, an argument plaintiff previously raised in an agency-level, pre-award protest. *See* Pl.'s MJAR at 9–10.  With respect to its post-award protest grounds, plaintiff alleges the Agency acted in an arbitrary and capricious manner by doing the following: (1) irrationally evaluating Harmonia's proposal by employing unstated evaluated evaluation criteria and consequently evaluating offerors unequally; (2) improperly assigning Harmonia's proposal negative and "high risk" ratings under Factors 2 and 3; and (3) performing an irrational tradeoff decision. *See generally* Pl.'s MJAR at 12–24.  In its Motion to Dismiss and Response, defendant contends that plaintiff is not an "interested party" and therefore lacks the requisite standing to bring suit.  Def.'s CMJAR at 1.  In the alternative, defendant claims that the Agency properly exercised its discretion in making an award decision, and that plaintiff "failed to demonstrate that the decision was irrational or the result of prejudicial violations of law." *Id.*

Whether a plaintiff has standing to pursue its claim in this Court is a "threshold jurisdictional issue." *Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–04 (1998)). Standing in bid protests is framed by 28 U.S.C. § 1491(b)(1), which requires that the bid protest be brought by an "interested party."  A protestor is an "interested party" if it is an actual or

prospective bidder "whose direct economic interest would be affected by the award of the contract." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (citing *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)).

"A protester's burden of establishing standing differs depending upon the nature of the protest." *Joint Venture of COMINT Sys. Corp. and EyeIT.com, Inc., and NetServices & Assocs., LLC v. United States*, 102 Fed. Cl. 235, 251 (2011), *aff'd*, 700 F.3d 1377 (Fed. Cir. 2012). In the context of a pre-award protest, the plaintiff must establish "a non-trivial competitive injury which can be addressed by judicial relief." *Weeks Marine*, 575 F.3d at 1362; *Worldwide Language Res., LLC v. United States*, 127 Fed. Cl. 125, 131 (2016). In a post-award protest, the plaintiff "must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Weeks Marine*, 575 F.3d at 1359; *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003). Given that Harmonia makes both pre-award and post-award arguments, which involve different remedies and are subject to different legal standards, the Court addresses them separately. *See COMINT*, 102 Fed. Cl. at 251.

### A. Motion to Dismiss under RCFC 12(b)(1)

Defendant moves to dismiss plaintiff's bid protest for lack of subject-matter jurisdiction pursuant to RCFC 12(b)(1), asserting Harmonia "has not shown that it had a substantial chance of winning the contract" and is therefore not an "interested party." Def.'s CMJAR at 11. Defendant's rationale is two-fold—Harmonia was considered the lowest ranked technical solution, and Harmonia was not considered for award due to its Marginal and high-risk ratings for Factor 2 and Marginal and medium-risk ratings for Factor 3. *Id.* at 11–12. Harmonia responds by stating that "the Court cannot rule on the merits for purposes of determining whether it has subject-matter jurisdiction in the first place." Pl.'s Resp. at 1–2. Plaintiff further argues that, "[b]ut for the errors Harmonia identified, it would have received substantially higher technical ratings, and lower risk assignments." *Id.* at 2. As defendant's Motion to Dismiss concerns Harmonia's post-award protest grounds, the applicable standard is whether Harmonia adequately demonstrated it had a substantial chance of receiving contract award. *See Weeks Marine*, 575 F.3d at 1359.

When considering a motion to dismiss for lack of subject-matter jurisdiction, the Court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). The plaintiff bears the burden of establishing this Court has jurisdiction by a preponderance of the evidence. *Diaz v. United States*, 853 F.3d 1355, 1357 (Fed. Cir. 2017); *see IHS Global, Inc. v. United States*, 106 Fed. Cl. 734, 743 (2012). As the Court must analyze prejudice for purposes of standing before deciding the merits, the former "is more properly considered as a question of potential rather than actual prejudice, and assessed based on the cumulative impact of the well-[pleaded] allegations of agency error[,] which are assumed true at this juncture of proceedings." *Tech Sys. v. United States*, 98 Fed. Cl. 228, 244 (2011) (citing *USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 450 (2010)). Thus, a "prejudice determination for the purpose of evaluating standing is a 'limited review' that seeks 'minimum requisite evidence necessary for plaintiff to demonstrate prejudice and therefore standing.'"

*Precision Images, LLC v. United States*, 79 Fed. Cl. 598, 618 (2007) (quoting *Night Vision Corp. v. United States*, 68 Fed. Cl. 368, 392, n.23 (2005)).

Contrary to defendant's assertions, this Court has routinely explained that "the Government cannot require a plaintiff to prove the merits of its case in order to demonstrate standing." *See, e.g.*, *Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 530 n.12 (2010). If the Court were to do so, it would "lead the court in a round-robin through the arguments on the merits in order to resolve a jurisdictional issue. Such is not a desirable or appropriate procedure." *Textron, Inc. v. United States*, 74 Fed. Cl. 277, 284–85 (2006). Thus, in assessing whether a plaintiff has standing, "the Court should look to Plaintiff's allegations, not prejudge the merits of a bid protest." *Caddell Constr. Co. v. United States*, 125 Fed. Cl. 30, 44 (2016) ("This Court should not deny a plaintiff access to the courthouse or bar a plaintiff from presenting a claim based upon the speculative construct that the plaintiff cannot ultimately win.").

Defendant does not dispute that Harmonia was an actual bidder in this case. Thus, the inquiry turns on whether Harmonia has a direct economic interest in the resolution of the protest. *See Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 37 (2010). The Solicitation explicitly states that, "if an Offeror receives a high[-]risk rating, regardless of technical ratings or price, that Offeror may not be considered for award." AR 286. Based on the high-risk ratings Harmonia received under Factors 2 and 3, the Agency did not consider Harmonia in its best value tradeoff decision. *See* Def.'s CMJAR at 11–12; *see also* AR 3052. Taking "the cumulative impact of the well-[pleaded] allegations of agency error" as true, the Court finds that, but for Harmonia receiving those high-risk ratings, Harmonia would have been considered in the Agency's best value tradeoff decision and in turn would have had a substantial chance of receiving the task order award. *See Tech Sys.*, 98 Fed. Cl. at 244. Accordingly, the Court finds plaintiff successfully established standing to pursue this action.

### B. Pre-Award Protest

Prior to filing its Complaint with this Court, Harmonia filed a pre-award protest with the Agency, claiming that the Agency improperly denied offerors the opportunity to revise their proposals in response to Amendments 9 and 10. Pl.'s MJAR at 9–10 n.2, 10. In *Blue & Gold Fleet, L.P. v. United States*, the Federal Circuit held the following:

> a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.

492 F.3d 1308, 1313 (Fed. Cir. 2007). Whether Harmonia is challenging the terms of the Solicitation is undisputed. Thus, the dispositive issue before the Court is whether Harmonia sufficiently objected to Amendments 9 and 10 prior to the close of the bidding process such that Harmonia did not waive its pre-award arguments.

Defendant argues that Harmonia waived its right to challenge Amendment 9 under *Blue & Gold*, as "Harmonia did not object to the alleged reduction in labor categories made in Amendment 9 prior to the close of the bidding process." Def.'s CMJAR at 13.  Harmonia counters, stating that the "waiver rule is not a jurisdictional bar, or even a statute of limitations. Rather, it is rooted in equity and sets up an equitable bar to untimely solicitation changes."  Pl.'s Resp. at 2 (citations omitted).  Thus, plaintiff argues that "[t]he waiver rule does not apply as the Agency insists," as Harmonia requested the opportunity to submit a fully revised proposal in its agency-level protest, and because "the Agency's decision specifically mentioned the combined effect of Amendments 09 and 10 (which it saw as 'additional flexibility towards pricing') as a basis for the denial."  *Id.* at 4 (citing AR 2899).  Moreover, Harmonia contends that, as Amendments 9 and 10 imposed the same limitation on proposal revisions and were due at the same time, had "the Agency sustained Harmonia's agency-level protest . . . Harmonia's revisions would have addressed any issues resulting from both Amendment[s]."  *Id.*

*Blue & Gold* does not define the degree of specificity with which a plaintiff must raise its objections prior to award.  Rather, the standard requires only that a plaintiff "object to **the terms** of a government solicitation" to avoid waiver.  *Blue & Gold*, 492 F.3d at 1313 (emphasis added). Though plaintiff's agency-level protest did not specifically mention a causal link between Amendment 9 and the protested terms, the record clearly demonstrates that Harmonia raised objections to the newly added terms of Amendment 9 that concerned the reduction in labor categories and allegedly impacted Harmonia's technical and price proposals.  *See* AR 2490–94. Additionally, both Amendments 9 and 10 were issued after initial proposals were received, included the same proposal revision limitations, and were due at the same time.  *See generally* AR 1537–1637 (Amendment 9), 1638–96 (Amendment 10).  Thus, in considering Harmonia's agency-level protest grounds as a whole, and despite plaintiff conflating its Amendment 9 and 10 arguments in its agency-level, pre-award protest, the Court concludes that Harmonia did not waive any of its objections to Amendments 9 or 10.

Separately, defendant-intervenor alleges that "Harmonia failed to diligently pursue its bid protest after its agency[-]level protest was denied," as Harmonia entirely failed to bring its pre-award protest before the Government Accountability Office ("GAO") and waited six months to file its pre-award protest at this Court.  Def.-Int.'s CMJAR at 5.  This, defendant-intervenor argues, runs contrary to policy considerations underlying *Blue & Gold*, as well as precedent at this Court.  *See id.* at 5–8.  In response, plaintiff claims defendant-intervenor "misstates the law," and that waiver cannot apply as "either an agency-level protest or a GAO protest would suffice to avoid the waiver rule's effect."  Pl.'s Resp. at 5.  Thus, by raising "the subject issue in a timely-filed, formal agency-level protest," Harmonia "satisfied its obligations under *Blue & Gold*."  *Id.* at 6.

The Federal Circuit has suggested that "filing a formal, agency-level protest before the award would *likely* preserve a protestor's post-award challenge to a solicitation, as might a pre-award protest filed with the GAO."  *Bannum, Inc. v. United States*, 779 F.3d 1376, 1380 (Fed. Cir. 2015) (emphasis added) (citing *COMINT*, 700 F.3d at 1382).  Here, Harmonia timely filed its agency-level, pre-award protest on November 12, 2019.  *See generally* AR 2490–94. The Agency issued its decision denying Harmonia's protest on December 6, 2018.  *See generally* AR 2898–901.  On April 23, 2019, nearly five months after the Agency denied Harmonia's

protest, the Agency issued its award decision.  *See generally* AR 3060–61.  Harmonia subsequently filed its Complaint at this Court on May 7, 2019.  Though the Court concludes Harmonia timely filed an agency-level protest, the Court finds plaintiff nevertheless waived its pre-award protest grounds by waiting five months to re-raise its pre-award arguments with its post-award protest grounds.

In *Esterhill Boat Services, Corp. v. United States*, this Court held that a protestor waived its pre-award protest ground where, after the protestor lost its timely filed pre-award, agency-level protest, the protestor "apparently gambled on winning the contract anyway, which was entirely within its rights, but then sued [at this Court] when it lost the gamble."  91 Fed. Cl. 483, 486–88 (2010) (holding that plaintiff waived its pre-award protest when the plaintiff "could have and should have protested immediately after its meeting with [the contracting officer]").  In determining whether a plaintiff timely raised its pre-award arguments, the Court looks to the decision in *COMINT*, in which the Federal Circuit interpreted timeliness and the waiver rule as follows:

> To be sure, where bringing the challenge prior to the award is not practicable, it may be brought thereafter.  But, ***assuming that there is adequate time in which to do so***, a disappointed bidder must bring a challenge to a solicitation containing a patent error or ambiguity ***prior to the award of the contract.***

700 F.3d at 1383 (emphases added).  Recognizing the facts in *COMINT* are different than those in the case at bar, the Court nonetheless finds the Federal Circuit's rationale in *COMINT* instructive.  In finding the protester waived its pre-award claims, the Federal Circuit in *COMINT* concluded that the protestor

> had ample time and opportunity to raise its objections to [the Amendment], but chose instead to wait and see whether it would receive an award of the contract.  Having done so, [the protestor] cannot now "come forward with [its objections] to restart the bidding process," and get a second bite at the apple.

*Id.* (quoting *Blue & Gold*, 492 F.3d at 1314); *DGR Assocs. v. United States*, 94 Fed. Cl. 189, 204 (2010).  These considerations are expressed in *COMINT*'s progeny, *Blue & Gold*, which makes clear that the waiver rule exists in large part to "prevent[] contractors from taking advantage of the government and other bidders, and [to] avoid[] costly after-the-fact litigation."  492 F.3d at 1314.  Other decisions in this Court have expanded upon that rationale when holding that the waiver rule does not apply to a protestor that "diligently pursued its position in a timely manner" by, for example, "continuously contesting the agency's [] decision in one forum or another."  *See, e.g.*, *Advanced Am. Constr., Inc. v. United States*, 111 Fed. Cl. 205, 220 (2013).  As such, the "proper inquiry is to assess whether a party has timely pursued an alleged defect in a solicitation as allowed by law, and whether the party has diligently pressed its position without waiver at each step of the way."  *DGR Assocs.*, 94 Fed. Cl. at 204; *see also Advanced Am. Constr., Inc.*, 111 Fed. Cl. at 219–21 (finding that the protestor diligently and timely pursued its pre-award protest where the protestor, within a week of receiving an adverse decision in its timely agency-level protest, filed an initial and supplemental protest at the GAO, and, several days after the GAO dismissed its protest as untimely, filed a protest with this Court).

Nothing in the record or in plaintiff's briefing meaningfully explains the five-month delay in Harmonia filing its pre-award protest with this Court.  The Court believes that allowing Harmonia to re-raise its pre-award claims months after the Agency's adverse protest decision and subsequent award decision would frustrate the holding in *Blue & Gold* and functionally give Harmonia a second bite at the apple.  As such, the Court cannot conclude that Harmonia diligently or timely pursued its position, particularly if the protested terms impacted Harmonia's proposal as severely as Harmonia claims.  Had Harmonia timely filed a pre-award protest with the GAO or this Court after its agency-level protest was denied, it would have avoided asking the Court to concurrently resolve both pre- and post-award protest grounds months after the Agency's award decision.[4]  Allowing the protest now would undermine the very reasons courts have consistently upheld the waiver rule in analogous protests.  Moreover, were plaintiff to subsequently prevail on its pre-award protest grounds, such an allowance would result in procurement delay and a waste of agency resources, as the Agency would be required to accept proposal revisions and then reassess proposals over a year after the Agency issued Amendments 9 and 10.

The Court cannot allow a protestor to shield itself from waiver under the guise of *Blue & Gold* by waiting months after receiving an adverse agency-level protest decision before reviving its pre-award claims in a post-award protest.  To permit parties to make this type of delayed filing would clearly frustrate the spirit of the law set forth in *Blue & Gold*.  Accordingly, the Court finds that while Harmonia facially met the requirements under *Blue & Gold*, Harmonia nevertheless waived its right to bring those claims before this Court by failing to timely and diligently pursue its objections to Amendments 9 and 10.

### C.  Post-Award Protest

Pursuant to RCFC 52.1, a party may file a motion for judgment on the administrative record for the Court to determine whether an administrative body, given all disputed and undisputed facts in the record, acted in compliance with the legal standards governing the decision under review.  *See Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 382 (2013) (citing *Fort Carson Supp. Servs. v. United States*, 71 Fed. Cl. 585 (2006)).  In such a motion, the parties are limited to the Administrative Record, and the Court must make findings of fact as if it were conducting a trial on a paper record.  RCFC 52.1; *Bannum*, 404 F.3d at 1354.  The Court will then determine whether a party has met its burden of proof based on the evidence in that record.  *Bannum*, 404 F.3d at 1355.

This Court reviews bid protests in accordance with the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2018).  *Axiom Res. Mgmt. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  Agency procurement actions

---

[4]      The Court also notes that, given the GAO's 100-day decision timeline, had Harmonia filed a protest with the GAO after receiving the denial of its agency-level protest, Harmonia would have received its GAO decision prior to the April 23, 2019 award date.  *See* 4 C.F.R. § 21.9(a).

may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 28 U.S.C. § 1491(b)(4). That highly deferential standard exists in large part because agencies and their "[c]ontracting officers in particular are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process.'" *See Savantage Fin. Servs. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (quoting *Impresa*, 238 F.3d at 1332); *see also Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).

When a protestor claims that an agency's decision violates a statute, regulation, or procedure, the protestor must show that such alleged violation was "clear and prejudicial." *Impresa*, 238 F.3d at 1333. In reviewing a protestor's claims, the Court cannot substitute its judgment for that of an agency, even if reasonable minds could reach differing conclusions. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974); *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (Where the Court "finds a reasonable basis for [an] agency's action, the [C]ourt should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."). Accordingly, the Court will "interfere with the government procurement process 'only in extremely limited circumstances.'" *EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 223 (2005) (quoting *CACI, Inc.-Fed. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989)).

Harmonia challenges several of the adjectival and risk ratings attributed to its Factor 1 (Technical Excellence), Factor 2 (Management Approach), and Factor 3 (Quality Assurance) evaluations. *See generally* Pl.'s MJAR. The Court addresses plaintiff's challenges to the Factor 2 and 3 evaluations first, as those Factors received risk ratings that disqualified Harmonia from consideration for award. *See* AR 30, 286, 3052.

### 1. Factor 2 Evaluation

The Agency attributed a significant weakness to Harmonia's proposal under Factor 2, Sub-Factor I based on its determination that the proposal "did not align teams to Core functional areas; such as Cargo Release, FTZ, ITDS, or AES which had been included in the RFQ release Amend. 004." Pl.'s MJAR at 19 (citing AR 2946). The omission of those functional areas allegedly contributed to Harmonia receiving a high-risk rating, as the Agency concluded that Harmonia's "proposed staffing plan [] will be insufficient, and cost will increase due to the delay in transitioning the applications." AR 2947. Based on analogous reasoning, Harmonia also received a significant weakness and high-risk rating under Sub-Factor II due to its omission of those applications. AR 2947–48. In ascribing a significant weakness and high-risk rating under Sub-Factor II, the Agency concluded that, "Harmonia does not fully demonstrate the knowledge and understanding of the Program and SOW requirements, which will lead to program failure." *Id.* Plaintiff claims this determination is a "quintessential example of an irrational evaluation" because, when judged against the "actual requirements of Attachment E, there can be no doubt that Harmonia submitted a responsive [proposal]." Pl.'s MJAR at 21–22. Regarding Harmonia's proposal description of its responsibility for ITDS and Cargo Release, Harmonia explained that, "[o]nly by unreasonably ignoring context could the Agency have reached [its] conclusion" and assign negative ratings to Harmonia's proposal. Pl.'s Resp. at 22. Last, plaintiff

asserts the strength it received for its team's "proven knowledge of the CPSD environment" undercuts the Agency's justification for assigning a significant weakness and, in turn, a high-risk rating.  *See* Pl.'s MJAR at 21–22.

Defendant contends the Agency did not employ unstated "Core functional area[]" requirements, as Cargo Release and ITDS "are identified in the scope of the SOW (and have been since the original solicitation)," and because AES is listed as a requirement in the overview section of the SOW pursuant to Amendment 4.  Def.'s CMJAR at 30–31.  Furthermore, Attachment E lists and explains the importance of 55 enumerated New Automated Commercial Environment ("N-ACE") applications, including Cargo Release, FTZ, ITDS, or AES, that are critical to CBP's approach to application and Agile development methods.  *Id.* at 31.  As such, it was neither arbitrary nor irrational for the Agency to attribute a significant weakness and high-risk rating under Sub-Factors I and II due to Harmonia's omission of Cargo Release, FTZ, ITDS, or AES from the required transition in tasks, or for failing to provide adequate staffing for those applications.  *Id.* at 30–32.  Defendant then cited examples to support its assertion that the language Harmonia used to describe the Cargo Release and ITDS applications in its proposal rationally led the Agency to conclude that Harmonia did not fully understand the relevant contract requirements.  *Id.* at 18–19.  In terms of the sole strength Harmonia received, defendant explained that "[p]roposing a team with proven knowledge of the CPSD environment . . . does not make up for the fact that Harmonia omitted functionalities," particularly where "[n]ot fully understanding the SOW requirements could lead to unsuccessful performance."  *Id.* at 32–33.

A disappointed bidder "bears a 'heavy burden' of showing that the award decision 'had no rational basis.'"  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)).  The Court will defer to an agency's expertise in making procurement decisions unless the agency has

> "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [issued a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Ala. Aircraft Indus., Inc. v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  "The evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations."  *Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 395 (2005) (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)).

The SOW clearly stated Cargo Release and ITDS are within the scope of support required under the contract.  AR 295.  Moreover, Attachment E to the RFQ emphasized and explained the importance of AES and ITDS to the functionality of the ACE system—the very bedrock of the procurement—and individually discussed the role and technical aspects of all fifty-five N-ACE applications, including Cargo Release, FTZ, ITDS, and AES, in great detail.  AR 1307–16.  As such, plaintiff's arguments that the Agency improperly assigned weaknesses and employed

unstated "Core functional areas" when evaluating Harmonia's proposal lacks merit, particularly where, as here, an offeror's management approach necessarily tied into its technical proposal. Given the highly technical nature of the services at issue and evident importance of each ACE application, the Court declines to substitute its judgment for that of the Agency, and instead defers to the special expertise of CBP's procurement officials. *See Beta Analytics*, 67 Fed. Cl. at 395.

Additionally, the Court concludes plaintiff's argument that the Agency irrationally determined Harmonia did not fully understand the contract's requirements amounts to a mere disagreement with the Agency's decision, and therefore falls short of meeting the burden of proof required to establish that the Agency's action was arbitrary and capricious. *See generally, e.g.*, *Blackwater Lodge & Training Ctr., Inc. v. United States*, 86 Fed. Cl. 488, 514 (2009). That same logic applies to plaintiff's argument that the Agency's assignment of a strength belied its assignment of a significant weakness. Accordingly, Harmonia was properly excluded from the best value tradeoff and resulting award decision based on the high-risk ratings it received under Factor 2, Sub-Factors I and II.

### 2.   Factor 3 Evaluation

Harmonia also received a high-risk rating under Factor 3, Sub-Factor I based on its failure to include Cargo Release, ITDS, and AES from a list of transition in milestones and general schedule in Section 3.1.5 of its proposal. AR 3028. As these tasks "are required in transitioning in," the Agency concluded a "high risk has been identified as these applications are major ACE functionalities and the omission of these critical ACE functionalities would lead to unsuccessful performance." *Id.* Harmonia claims Factor 3 required offerors "to 'provide a transition plan that outlines the Offeror's approach to taking full ownership of the requirements,'" but that "there was no requirement to discuss any applications." Pl.'s MJAR at 22 (quoting AR 1691). Regardless, plaintiff states Harmonia's proposal "specifically mentioned each of these applications." *Id.* (citing AR 2618). Thus, plaintiff argues, the Agency once again employed the same flawed analysis under Factor 3, Sub-Factor I as it did for Factor 2, Sub-Factor I, and "repeated its mistake" under Factor 3, Sub-Factor II, in assigning Harmonia a risk for failing to discuss "Core ACE functionalities." *Id.* at 19–20 (citing AR 2592).

In its Response, defendant contends that Harmonia insufficiently addressed the Core ACE functionalities and SOW requirements. Def.'s CMJAR at 33. Specifically, defendant argues that Harmonia's

> only "mention" of these applications . . . is to "Identify and Document Key Contracts" related to "Unisys (AES, ITDS, Cargo Release)." (AR 2618.) A 10-day milestone for identifying and documenting key contracts regarding AES, ITDS, and Cargo Release is not the same as a milestone for transitioning these functions to Harmonia.

*Id.* Defendant contends that simply mentioning those applications for the purpose of identifying and documenting key contracts "is not enough to show that Harmonia understood that it was required to transition to them, like the numerous other applications from the SOW and

18

Attachment E that it did list." *Id.* at 34.  As Cargo Release, ITDS, AES, and FTZ are requirements listed in the SOW, defendant contends that it was neither arbitrary nor irrational for the Agency to assign Harmonia a significant weakness and high-risk rating under Factor 3, Sub-Factor I.  *See id.*

Consistent with its review of the high-risk ratings under Factor 2, Sub-Factors I and II, the Court likewise finds no evidence in the record demonstrating that the Agency irrationally or arbitrarily assigned a high-risk rating under Factor 3, Sub-Factor I.  As such, Harmonia was properly excluded from award consideration based on its Factor 3, Sub-Factor I high-risk rating. Additionally, the Court notes that the Solicitation unambiguously notified offerors they would not be considered for award if they received a high-risk rating, "regardless of technical ratings or price."  AR 286.  As the Court has found the Agency did not irrationally assign Harmonia high-risk ratings under Factor 2, Sub-Factors I and II, and Factor 3, Sub-Factor I, the Court need not reach the merits of plaintiff's Factor 1 arguments given that Harmonia was ineligible for award based on those ratings in accordance with the terms of the Solicitation.  Based on the foregoing reasons, the Court finds no evidence establishing that the Agency acted in an arbitrary or capricious manner when evaluating proposals or in making an award decision.

**V.       Conclusion**

For the reasons set forth above, defendant's MOTION to Dismiss pursuant to RCFC 12(b)(1) and plaintiff's MOTION for Judgment on the Administrative Record are hereby **DENIED**.  Defendant and defendant-intervenor's CROSS-MOTIONS for Judgment on the Administrative Record are hereby **GRANTED**.  The Clerk is directed to enter judgment in favor of defendant and defendant-intervenor, consistent with this opinion.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith
Senior Judge